Filed 8/22/24  P. v. Valdez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE ANGEL TORRES VALDEZ, JR.,<br><br>    Defendant and Appellant. | E082110<br><br>(Super.Ct.No. INF2000808)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Steven G. Counelis, Judge.  Affirmed.

Jose Angel Torres Valdez, Jr., in pro. per.; Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

A jury found defendant and appellant Jose Angel Torres Valdez, Jr., guilty of burglary (Pen. Code, § 459, count 1),[1] assault (§ 240, count 2), and attempted robbery

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

(§§ 664, 211, count 3). The jury additionally found true allegations that in his commission of the robbery and assault, defendant entered an inhabited dwelling while a person, other than an accomplice, was present. (§ 667.5, subd. (c)(21).)

The court thereafter found true several aggravating factors. (Cal. Rules of Court, rules 4.421(a)(1), 4.421(a)(2)), 4.421(a)(6), 4.421(b)(1) & 4.421(b)(2).) The court also found true allegations defendant had suffered a prior strike (§ 1192.7, subd. (c)(8)) and a prior serious felony conviction (§ 667, subd. (a)); however, the court struck the prior strike conviction allegation pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).[2] The court sentenced defendant to 16 months of imprisonment.[3]

Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) and *Anders v. California* (1967) 386 U.S. 738, setting forth a statement of the facts, a statement of the case, and identifying four potentially arguable issues: (1) whether sufficient evidence supported defendant's conviction for burglary; (2) whether the trial court erred in admitting a picture of defendant taken at the police station; (3) whether the court erred in instructing the jury regarding flight and motive; and (4) whether the court erred in ruling that evidence of defendant's prior convictions could be admitted for impeachment purposes.

---

[2] The court also apparently struck the prior serious felony conviction enhancement.

[3] The court imposed the sentence consecutive to a 54-year sentence it imposed in another case.

We offered defendant the opportunity to file a personal supplemental brief, which he has done. Defendant contends the court violated his federal constitutional right to a speedy trial (U.S. Const., 6th Amend.); he further maintains that the primary witness was influenced by unspecified "bias and hearsay," that the same witness committed unspecified perjury, that the People committed error under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) in failing to disclose unspecified exculpatory evidence, which purportedly discredited the victim's testimony, and that the transcripts contain several unspecified errors. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

By felony complaint filed June 10, 2020, the People charged defendant with burglary, assault with a deadly weapon, and robbery committed on or about November 12, 2019. The People additionally alleged that during defendant's commission of the robbery, a person, other than an accomplice, was present. The People also alleged defendant had suffered a prior serious felony conviction and prior strike conviction. The People alleged Miguel Angel Zazueta Dominguez and Angela Lopez were the victims of defendant's offenses.

On July 29, 2021, defense counsel filed a temporary emergency waiver of defendant's personal presence in which he asserted, "I have fully explained to the above-named defendant his/her speedy preliminary hearing rights . . . and he . . . has authorized me to waive time on his . . . behalf." On September 14, 2021, the court granted a stipulated request to continue the date for the preliminary hearing. Defendant waived

time.  On October 28, 2021, the court granted defendant's motion to continue the date for the preliminary hearing.  Defendant, again, waived time.

On January 5, 2022, the court granted a stipulated motion to continue the preliminary hearing.  Defendant waived 30 days.  On February 9, 2022, the court granted another stipulated motion to continue the preliminary hearing; defendant waived time.

The court held the preliminary hearing on March 30, 2022, at the conclusion of which, the court held defendant to answer.  By information filed April 6, 2022, the People charged defendant with burglary, assault with a deadly weapon, robbery, and the prior conviction allegations.

On April 22, 2022, the court granted defense counsel's motion to continue the matter.  On May 23, 2023, the court granted defense counsel's motion to continue the trial.  Defendant waived time.

On June 13, 2022, defendant personally filed a motion to dismiss the case for delay in prosecution and violations of his constitutional right to a speedy trial.  Defendant alleged that on May 23, 2022, the court had granted the People's motion to continue the matter because the prosecutor had COVID.  On the same date, the court placed defendant's motion on calendar.  On July 11, 2022, the court granted a defense motion to continue the matter on the basis that defense counsel needed more time to prepare.

On July 15, 2022, the court and counsel conferred regarding defendant's request for a speedy trial.  The court granted defendant's request to withdraw his motion and

found good cause to continue the trial. On September 8, 2022, the court granted another continuance because defense counsel was in trial on another matter.

During a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 on November 7, 2022, the court stated, in apparent reference to something spoken off-record, "as to your speedy trial rights, . . . . There is nothing you can do about that because of COVID." Defense counsel announced he was ready for trial. On November 21, 2022, the court continued the matter because defense counsel was in trial on another matter.

The People filed a first amended information on December 8, 2022.[4] Jury selection began on the same day.

In the People's trial brief filed December 12, 2022, the People sought admission of "some" of defendant's prior criminal convictions for impeachment purposes should defendant choose to testify. At hearings on December 12 and 13, 2022, the People specifically sought admission of defendant's 2008 conviction for battery inflicting serious bodily injury and nine recent, nonfinal convictions that included criminal threats, witness intimidation, and kidnapping; the court had yet to sentence defendant on the latter convictions.

The court gave defense counsel a day to conduct more research on the issue.[5] The next day, the court denied the People's request to impeach defendant with his prior

---

[4] After trial, the court arraigned defendant on a second and third amended information with minor differences intended to conform to the evidence adduced at trial.

[5] The primary issue concerned whether nonfinal judgments could be used for impeachment purposes at trial.

conviction for battery inflicting serious bodily injury; however, the court reserved ruling on the People's request as to defendant's other convictions.

Defense counsel requested the court allow impeachment of Dominguez's testimony with his criminal conviction for criminal threats. Dominguez allegedly "went to [defendant's] house to look for his estranged wife, and [defendant] was carrying a gun. That was the allegation made by the ex-wife or the estranged wife. [¶] He said that he was going to shoot up the truck—[defendant's] truck—and shoot up the house, or something to that effect. So I think that's—that conviction is—the grounds is admissible, one, to show his bias and animosity towards [defendant]."

The People responded that defendant was not mentioned as the victim in any of the police reports for that incident. The court reserved ruling on the issue.

Defense counsel later requested "reports" on an arrest of Dominguez. The court noted, "And so we have a very last-minute unexpected discovery glitch between the parties, and the People will [be] working on it this afternoon." The People responded, "We've been working on it. I've been trying to work on the issues since we left court this morning, but some delay was caused by a large portion of the clerical staff having gone to lunch." "It's just taking more time than it normally would." "We've been starting since we left court this morning."

One of the reports had not been brought to the People's attention until the morning of the preliminary hearing when defense counsel asked "the People's witness a question about the defendant, and the witness responded to that question. After that response,

defense counsel did ask us to make efforts to obtain a police report that, I think, could potentially be used for defense impeachment—or we don't know what is in the report or even if a report exists, but we are making efforts to locate that."

The court later presented the parties with case law that permitted the use of nonfinal convictions for impeachment purposes. Defense counsel argued the case was nonbinding and that use of the convictions would be unduly prejudicial. The court ruled that it would permit the People to impeach defendant with three of defendant's nine recent felony convictions: the convictions for kidnapping, criminal threats, and dissuading a witness by force or threat of force.

On December 14, 2022, at the court's request, the People noted, "As soon as defense counsel had requested them yesterday, I did run a search in our system, and I did find the police report in question." "I have now had the chance to review all the police reports." "[A]t this point, I do think the defense is entitled to those reports."

The People noted that Dominguez had been arrested on April 8, 2020, after the incident for which the People were charging defendant. Nonetheless, the People posited that the circumstances of the arrest could potentially be used to show bias during any cross-examination of Dominguez: "A brief, I guess, factual summary of what is included in the reports is that there is an ex-girlfriend that both the defendant in this case and . . . Dominguez share in common. She reached out to the police to provide them information on [Dominguez]—potentially selling cocaine and possessing firearms."

"At the time of the police report, [Dominguez] was on misdemeanor summary probation . . . that has been disclosed to defense counsel." Police did a probation compliance check of Dominguez's car and residence. "[T]hey did ultimately locate some narcotics and a firearm in his possession, and he was then booked and—on those charges." Subsequent to Dominguez's release, Dominguez discovered that Marlene Romero had been the one who reported him to the police, which resulted in his search and arrest.[6] Dominguez "became very upset about that and sent many text messages to her." "I believe his communications with her are the basis for when law enforcement had requested a [section] 136.1 [charge]."

Defense counsel responded that he did not "have the reports. I'm waiting for them, and I'll reserve my comments until I receive those reports. It is a late disclosure, but I commend [the People] for making it happen. Nonetheless, I don't know what those reports contain." Defense counsel noted that he would move the court to dismiss the case based on the late disclosure.

The court observed, "We should have resolved these issues before we impaneled the jury. And being a slave to the last day, even though it's a statutory right, creates greater impacts upon the lawyers, the representation the lawyers can offer. It puts undue pressure on the lawyers when a problem arises, because now we have a jury impaneled. And [defense counsel] is under pressure to adequately represent his client in the face of

---

[6] Romero was Dominguez's estranged wife; the record conflicts as to whether they were divorced or remained married. At the time of the burglary, Romero was present and living with Dominguez and Lopez, Dominguez's then girlfriend.

100-plus new pages of discovery when, you know, we have a panel of—the jury about to come in and give opening statements."

"It seemed like we rushed headlong into—in this case unnecessarily, frankly. Had we just had a few more days of pretrial motions without picking a jury, which is the traditional way of conducting a trial. We don't bring a jury up until we're done with the pretrial motions, and that's the normal schedule." "And, again, being a slave to the statutory last day is—well, now we experience the consequences, and they are all negative, frankly, in my view."

Matthew McKinney then testified that on November 12, 2019, he was in an apartment in Bermuda Dunes taking a nap when he heard a loud noise, which woke him. He looked out his window and saw two men. McKinney went to put a shirt on and heard another loud "bang." He went outside and saw people running. McKinney's upstairs neighbor came downstairs bleeding and holding a ceramic knife. The door frame of his neighbor's apartment appeared kicked in.

After McKinney's testimony, the court inquired about the status of the search for records being conducted by the People. The People responded they had received additional information from defense counsel that morning: "I still haven't been shown the text message, but it's purported to have been sent by this victim, so we are operating without a lot of information. Because I didn't have the potential agency. I didn't have the date. So we've been doing a search, but it was casting quite a large net."

That afternoon, defense counsel moved "to dismiss the case based on the late disclosure on the Brady information that I just received." "I am just getting to read part of the information. I have probably gotten through one-fourth of the information provided to me this morning. Again, we are in the middle of trial. This is information that is highly material for the impeachment of the main complaining witness in this case."[7]

Defense counsel had received an email with a list of Dominguez's convictions from the People, which in turn had been "extracted from an email from the prior prosecutor." The original email has been received by defense counsel from that prosecutor one to two years earlier. At the end of that list was an arrest for Dominguez that occurred on May 28, 2020, for dissuading a witness, which listed its conviction date as "'see above.'" The conviction date listed above for that offense was February 11, 2020. "That's for the criminal threat where the victim was . . . Romero, which is . . . Dominguez['s] . . . estranged wife. They are still legally married, apparently." Defense counsel alleged that Romero had complained that Dominguez had gone and looked for her at defendant's residence with a gun and that Dominguez had threatened to shoot up defendant's house. That behavior purportedly resulted in Dominguez's conviction on February 11, 2020.

Defense counsel contended that the listing of the arrest date as occurring after the conviction date "seems like an attempt to conceal the fact that that case was still being

---

[7] The reports are not part of the record on appeal.

10

investigated." Dominguez was "found to have cocaine in the house, baggies, a scale, and a gun." Police then attempted to garner a relationship with Dominguez as an informant. "[A]ll of this information was just provided to me, and . . . we have a jury impaneled. Now, I have to send my investigator out to talk to . . . Romero." Defense counsel alleged Romero had a restraining order against Dominguez. "Again, all of this information was unknown to the defense until now. So I—obviously, this goes to the character, especially to the legitimacy of the complaint by the complaining witness that my client is the one who went to [Dominguez's] house, his credibility, and so on and so forth."

The People noted that the date of the incident at issue postdated the offense for which the People were currently prosecuting defendant. On January 12, 2021, the People had emailed defense counsel a report of Dominguez's criminal history, which included the arrest and charge at issue. Defense counsel never previously requested that arrest report. Only upon the People's motion to exclude evidence of prior misconduct by Dominguez did defense counsel request the report. Upon that request, the People "immediately pulled up the report, looked into it, and then provided it to defense."

The People conceded "that there's substantial impeachment material of the victim in this report." However, the People maintained the information had "not been suppressed because defense is in actual possession of this entire report and demonstrated to the Court he has a very thorough working knowledge of these facts." Thus, the People contended defendant had suffered no prejudice because defense counsel had the information with which to impeach Dominguez before he actually testified, if, in fact,

11

Dominguez testified at all. Furthermore, the People contended any remedy would be a continuance, not a dismissal.

Defense counsel replied that the pertinent information was not just for impeachment purposes: "This provides me the evidence that I need to mount my affirmative defense that my client is not the one that went into [Dominguez's] residence. [Dominguez] was dealing drugs day in and day out of his house. He had weapons. He had people coming in, consuming drugs in his house. It happened to present an opportunity for him to blame some stuff that happened in his house, to blame it on my client." "Again, all of that I haven't been able to investigate because all of these reports were not provided to me before. I can investigate, and I can either corroborate or simply ignore that defense. But right now it is not available to me because we're in the middle of trial." Defense counsel indicated he wanted to interview Romero and potentially subpoena her to testify. "I don't know whether she would be a witness, a credible witness for my defense."

The court found that the People had complied with their duty of disclosure. The court noted that if the People did not call Dominguez to testify, "then I believe your motion to dismiss the case based upon a Brady violation most certainly becomes moot."

Defense counsel responded that he had a prepaid flight to be with his "family for the Christmas season," so "a brief continuance is not going to help me personally . . . . My client has been screaming and yelling 'speedy trial, speedy trial' since day one. He hasn't waived time."

The court responded, "You know, people have to make choices between rights all the time. Some rights are more important than other rights. If he wants a fundamentally fair trial, then speed is going to be sacrificed. And I told that to the jury. I said I am taking my time in this case." "I don't want to make any mistakes. I want to be fundamentally fair to both sides. And efficiency is a value which is lower than fundamental fairness."

The court ruled, "With respect to your motion, though, at this point, I'm denying the motion to dismiss. I am prepared to give you a remedy, which is less than a dismissal, to cure the late discovery to you. But it would not be a dismissal because the duty is continuing—Brady duty is continuing." The People indicated, "It's not my intention to call . . . Dominguez . . . at this time."

The court offered defendant additional time to follow up on the late discovery. Defense counsel spoke to his client and responded, "I would need the rest of the day today—well, I would like to have the rest of the day today and tomorrow to finish reading these reports, have my investigator who's present here . . . in the courtroom and have him interview a couple of people that are mentioned in this report." The court granted defense counsel the additional time requested.

On December 19, 2022, prior to Lopez's testimony, the court noted, "I'm told by . . . defense counsel—there will be areas of inquiry that are of concern to the People based upon the discovery of police reports that were—to an arrest of the other witness,

. . . Dominguez, and so let's turn to [defense counsel]. [¶] What are the areas of inquiry that are based off . . . the newly discovered reports?"

Defense counsel responded, "The only part that I make inquiry about of . . . Lopez, is that whether she—you know, she knew of . . . Dominguez's drug-dealing activity and if she knew other people came and visited . . . Dominguez."

The People noted, "The . . . search that ended [up] locating drugs at . . . Dominguez's residence was in April of 2020, which is several months after this alleged incident. So just because he was in possession of drugs for sales in April of 2020 does not mean that he was in possession of drugs for sales in November of 2019. And I think that is—defense is, like, somewhat trying to say, 'Because he had them five months later, he must have also had them on this previous date,' but we don't have any evidence to that effect."

The court ruled that defense counsel could "inquire of [] Lopez with respect to her personal knowledge about the involvement of [Romero]. And the fact that . . . [Romero], quote, 'ratted' out [Dominguez] to the police and that she's aware of a subsequent search of her premises—any concern about that?"

The People offered to stipulate regarding the matter to eliminate any necessity of inquiring of the witness. The parties then stipulated that "'On April 8, 2020, . . . Dominguez was investigated and subsequently arrested for possession of cocaine for sales." "Suspected cocaine and possible indicia of sales were located in the residence on

the date of his arrest.'" The parties agreed the stipulation negated any necessity of inquiring of the witness on the matter. The court admitted the stipulation as exhibit 1.

Lopez testified that on November 12, 2019, she was living in an apartment in Bermuda Dunes with Dominguez, Romero, and Romero and Dominguez's two children. She, Dominguez, and the children were in the bedroom when they heard a knock on the door. Lopez and Dominguez looked through the kitchen window; she saw two men wearing hoodies; Dominguez asked them what they wanted; they told Dominguez his dog was outside; Dominguez said, "'we don't have a dog.'" Dominguez told them, "'Get the fuck out of here.'"

The men started banging on the door. "It sounded like they must have been kicking the door." Lopez and Dominguez attempted to hold the door closed.

At some point the door opened; the door frame broke so they could not shut the door. Defendant entered the apartment and tried to grab a PlayStation they had in the living room.[8] Dominguez and defendant started fighting. Defendant grabbed a piece of the broken door frame and threw it at Dominguez. Defendant then took off running outside.

Thereafter, defense counsel objected to the People's intent to introduce "pictures that depict my client being forced to take a picture. And I just think it is overly

---

[8] Lopez recognized defendant because she had previously seen him with Romero. He had come to the apartment many times prior to the incident. She identified defendant to police that day.

15

prejudicial and no probative value."[9]  The People responded, "I would note this exhibit was previously shown to defense counsel.  He authenticated.  No objection was noted to me at that time.  Aside from that, while it is not the best photo of him, they are lifting his head.  You can see a red mark on the neck, and you can see the shoes.  The defendant was wearing those shoes [which] became crucial to the investigation.  [¶]  This is the photograph.  We have the defendant wearing them, and I believe that Deputy Hammond will testify those were collected into evidence and are consistent with the prints that were lifted from the door of the victim's apartment."

The court requested that defense counsel expound upon his objection.  Defense counsel responded, "It's just the way [in] which my client is depicted.  He's forcefully being put up on the . . . lens of the camera.  I think that will give . . . the wrong impression [of] my client."  "I think there's undue prejudice for the way he's being depicted—being forced to be taken a picture of that day.  My client was intoxicated on that day. . . ."  "It's too inflammatory, . . ."

The court ruled, "So under a[n Evidence Code section] 352 analysis, the question is whether . . . the photograph is substantially prejudicial, value substantially outweighs the probative effect under [Evidence Code section] 352.  I find that that is not the case.  It is relevant to show the photograph of the shoes the defendant was wearing."  "It's hard to tell if he's cooperative or uncooperative.  But, in any event, it's also being used to show some type of injury . . . some kind of mark on his neck."  "There's nothing about the

---

[9]  The exhibit featuring the picture of which defense counsel complained is not part of the record on appeal.

16

photograph that shocks the conscience." "[I]t will be admitted, and you may show it to the jury."

A forensic technician testified he had conducted gel lifts of shoe prints found in the residence. He also collected defendant's shoes. The technician had taken a photograph of defendant that day which documented "possible injuries to the left side of his head—neck" and showed his shoes. The People moved the shoes into evidence.

Sergeant Jeffery Hammond testified he was designated the lead investigator. He obtained a warrant for the contents of defendant's cell phone. Location data extracted from the phone reflected its presence in and around the crime scene on the day of the incident.

Lopez informed Hammond she recognized the man who entered the apartment; she identified defendant as that man from a picture he showed her that day. Hammond compared defendant's shoes to the prints taken at the scene; they appeared to be the same size and distinctive pattern. When he later encountered defendant, defendant "had what appeared to be scratching and bruises on the left side of his neck and some bruising along the back of his hand and knuckle area," which were indicative of having been involved in a physical altercation.

After the People rested their case-in-chief, defense counsel indicated defendant wished to testify. Defense counsel renewed his objection to the admission of defendant's prior convictions for the purpose of impeachment. The court reiterated its ruling that defendant could be impeached with three of his nine most recent prior convictions.

17

Defendant thereafter elected not to testify "because of the possibility of having [his] prior convictions . . . brought up."

Defense counsel objected to the court's instruction of the jury with CALCRIM No. 370 on motive. The court overruled the objection finding "there's actually quite a bit of motive testimony here." Defense counsel also objected to instruction of the jury with CALCRIM No. 372 on flight noting, "I don't think there's evidence that my client . . . fled." The court overruled the objection. The court instructed the jury with both CALCRIM No. 370 and CALCRIM No. 372.

## II. DISCUSSION

### 1. Speedy Trial

Defendant contends his constitutional right to a speedy trial was violated. We disagree.

"'In general, delays sought by the defendant's counsel weigh against the defendant's claim of a speedy trial violation. [Citation.]'" (*People v. Carter* (2024) 15 Cal.5th 1092, 1100.) "'"[A]ssigned counsel generally are not state actors for purposes of a speedy-trial claim."'" (*Ibid*.) "'"Their 'inability or unwillingness . . . to move the case forward,' [citation], may not be attributed to the State simply because they are assigned counsel." [Citation.]'" (*Ibid*.)

A defendant forfeits any claim that his speedy trial rights were violated by failing to object below. (*People v. Wilson* (1963) 60 Cal.2d 139, 146-147.) Trial delays due to the COVID-19 pandemic are not inherently violative of a defendant's speedy trial rights.

18

(*Stanley v. Superior Court* (2020) 50 Cal.App.5th 164, 166 ["[t]he severity of the COVID-19 pandemic and the impact it has had within the state independently supported the trial court's finding of good cause to continue . . . defendant's trial."]; accord, *Hernandez-Valenzuela v. Superior Court* (2022) 75 Cal.App.5th 1108, 1129-1135; *Elias v. Superior Court* (2022) 78 Cal.App.5th 926, 941-942.)

"To warrant dismissal . . . the defendant must first show actual prejudice resulting from the delay. [Citation.] The showing of actual prejudice must be made on competent evidence and 'must be supported by particular facts and not . . . by bare conclusionary statements.' [Citation.] Speculative arguments are inadequate to establish actual prejudice. [Citations.] Instead, the defendant must affirmatively demonstrate having suffered actual prejudice as a result of the delay, not just the possibility of prejudice. [Citation.]" (*People v. Manzo* (2023) 96 Cal.App.5th 538, 541-542.)

Here, although defendant contends he never waived time, the record reflects otherwise. On July 29, 2021, defense counsel filed a temporary emergency waiver of defendant's personal presence in which he asserted that defendant had authorized him to waive time on his behalf. The record reflects that defendant subsequently waived time on five occasions.

Moreover, "'delays sought by the defendant's counsel weigh against the defendant's claim of a speedy trial violation. [Citation.]'" (*People v. Carter* (2024) 15 Cal.5th 1092, 1100.) Here, defense counsel's requests for continuance were based on his need to prepare for the case and balance his other obligations.

19

Furthermore, it appears defendant forfeited any contention that his speedy trial rights were violated by withdrawing his motion to dismiss the case on that basis. Finally, it appears that the COVID-19 pandemic was at least partially responsible for the continuances. Thus, defendant cannot establish that the bulk of the continuances were based on state action or were unreasonable state responses to unprecedented challenges. Moreover, defendant has not shown any prejudice from the delay.

### 2. *Brady*

Defendant contends the People committed *Brady* error presumably by failing to timely disclose evidence that Dominguez had been arrested for threatening Romero, defendant's ex-girlfriend and Dominguez's current girlfriend and for dealing drugs. We disagree.

"The United States Supreme Court has identified three components of a *Brady* violation: (1) the evidence at issue must be favorable to the accused because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) the defendant must have been prejudiced by the nondisclosure. [Citation.] 'Prejudice' in the context of a potential *Brady* violation turns 'on "the materiality of the evidence to the issue of guilt [and] innocence."' [Citation.]" (*People v. Deleoz* (2022) 80 Cal.App.5th 642, 656.)

"To demonstrate materiality, a defendant '"must show a 'reasonable probability of a different result.'"' [Citation.]" (*People v. Deleoz, supra*, 80 Cal.App.5th at p. 656.) "'A "reasonable probability" of a different result is accordingly shown when the

government's evidentiary suppression "undermines confidence in the outcome of the trial."' [Citation.] 'In determining whether evidence is material under this standard, we consider "'the effect of the nondisclosure on defense investigations and trial strategies.'"' [Citation.]" (*Ibid.*) "On appeal, we independently review whether a *Brady* violation occurred, giving great weight to the trial court's findings of fact if they are supported by substantial evidence. [Citation.]" (*Id.* at pp. 656-657.)

Here, on January 12, 2021, nearly two years earlier, the People had emailed defense counsel a report of Dominguez's criminal history, which included an itemization of the arrest and conviction at issue. Defense counsel had never previously requested that arrest report. Only upon the People's motion to exclude evidence of prior misconduct by Dominguez did defense counsel request the report. Upon that request, the People "immediately pulled up the report . . . and then provided it to defense."

The People conceded "there's substantial impeachment material of the victim in this report." However, the People correctly maintained the information had not been suppressed because defense counsel was in possession of the report prior to Dominguez's testimony. In fact, Dominguez never testified.[10] Thus, as the People contended, defendant suffered no prejudice.

Furthermore, as the People maintained, any remedy would not be dismissal, but a continuance to permit defense counsel to further evaluate the impeachment materials.

---

[10] Thus, as the court observed, defendant's *Brady* motion "most certainly bec[ame] moot."

Thus, the court correctly denied defense counsel's motion to dismiss but granted defense counsel the additional time he requested to review the new materials.

Additionally, after reviewing all the newly disclosed documentation, the only impeachment evidence defense counsel sought to admit was that Dominguez had been dealing drugs. Upon the People's offer, the parties stipulated that "'On April 8, 2020, . . . Dominguez was investigated and subsequently arrested for possession of cocaine for sales. . . . Suspected cocaine and possible indicia of sales were located in the residence on the date of his arrest.'"

Defense counsel never inquired of Lopez whether she was aware that Romero had informed on Dominguez even though the court had expressly permitted such inquiry. Thus, there is no reasonable probability defendant would have obtained a different result had the People supplied the report on Dominguez's arrest to defense counsel at an earlier date; the late disclosure does not undermine confidence in the outcome of the trial.

3. *Perjury, Bias, and Transcription Errors*

In the first instance, we could find defendant forfeited his arguments because he has failed to argue or support them with any authority. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [arguments not supported by adequate argument or authority may be deemed forfeited].) Here, defendant fails to specifically identify any perjury, bias, or transcription errors.

Nonetheless, we note that, "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive

22

province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

Here, the jury heard, weighed, and obviously, by virtue of its verdict, believed Lopez's testimony. Weighing the veracity of Lopez's testimony was the jury's province, not ours. Thus, reversal is not justified. Finally, we observe no transcription errors that would rise to the level where we would question their integrity. (See *People v. Suarez* (2020) 10 Cal.5th 116, 147-148 [Defendant failed to show that transcription errors violated his rights or prejudiced him.].)

Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the record for potential error and find no arguable issues.

## III. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

MILLER
J.

MENETREZ
J.

23